**COLE SCHOTZ P.C.**
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
(212) 752-8000
(212) 752-8393 Facsimile
Leo V. Leyva
Ilana Volkov
*Attorneys for 100 Mile Fund, LLC*

Hearing Date and Time:
**March 31, 2016, at 10:00 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>BIOMBO, INC. et al.<br><br>Debtors.[1] | Chapter 11<br>Case No. 16-22248 (RDD)<br><br>(Jointly Administered) |

**REPLY OF 100 MILE FUND, LLC IN FURTHER SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER: (A) DISMISSING THE DEBTORS' CHAPTER 11 PETITIONS PURSUANT TO 11 U.S.C. 1112(b) OR ALTERNATIVELY, (B) GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. 362(d) OR APPOINTING A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. 1104(a), (C) ENFORCING 100 MILE FUND, LLC'S ABSOLUTE ASSIGNMENT OF LEASES AND RENTS BY PROHIBITING THE DEBTORS FROM UTILIZING RENTS GENERATED FROM THEIR PROPERTIES, AND (D) REQUIRING THE DEBTORS TO PROVIDE AN ACCOUNTING**

Of Counsel and on the Brief:
    Leo V. Leyva
    Ilana Volkov
    Michael R. Yellin

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are: (i) Biombo, Inc. (5738) (Case No. 16-22248), (ii) 173 Cortlandt St. LLC (8894) (Case No. 16-22256), (iii) 144 Cortlandt St. LLC (7987) (Case No. 16-22254), (iv) 146-148 Cortlandt Street, LLC (4638) (Case No. 16-22255), (v) Shippy Realty Corporation (0736) (Case No. 16-22249), (vi) Dari Realty Corp. (8717) (Case No. 16-22250), and (vii) Dashley Corp. (2076) (Case No. 16-22253) (collectively, "Debtors").

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

LEGAL ARGUMENT ........................................................................................................... 2

    I.    THE DEBTORS' CHAPTER 11 PETITIONS WERE FILED IN BAD FAITH. ................................................................................................................... 2

    II.    DEBTORS ARE EITHER WILLFULLY MISAPPROPRIATING CASH GENERATED FROM THE PROPERTIES OR ARE GROSSLY MISMANAGING THE PROPERTIES. ................................................................. 4

    III.    DEBTORS DEFAULTED UNDER THE TERMS OF THE LOAN DOCUMENTS. .............................................................................................................. 8

        A.    Debtors Failed to Disclose the ATS Judgment ........................................... 8

        B.    Debtors Failed to Pay Taxes and Other Charges ..................................... 10

        C.    Debtors Failed to Pay Their January 2016 Debt Service Obligation. ........ 12

CONCLUSION .................................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

In re C-TC 9th Ave. Partnership, 113 F.3d 1304 (2d Cir. 1997) ................................................. 2, 3

In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518 (Bankr. E.D.N.Y. 1989) .............................. 7

**RULES**

L. B. R. 1007-2 ........................................................................................................................ 4, 5, 6

**STATUTES**

11 U.S.C. 1101, et seq. ........................................................................................................ *passim*

11 U.S.C. 350(b) ............................................................................................................................ 8

47702/0046-12955089v1

## **PRELIMINARY STATEMENT**[2]

Debtors' entire opposition is premised on two arguments: (1) that the Debtors are not in default under the Loan Documents; and (2) that the Debtors' principal, Cirilo Rodriguez, is appropriately managing the cash generated from the Debtors' properties. Both of these positions are demonstrably false. Because Debtors have failed to meet their burden of establishing that their Petitions were filed in good faith, this Court should grant 100 Mile's Motion and, inter alia, either: (a) dismiss the Debtors' Chapter 11 Petitions; (b) grant relief from the automatic stay; or (c) appoint a Chapter 11 Trustee to oversee and manage the Debtors' properties.

As an initial matter, the Debtors do not dispute that the rents generated from their properties belong to 100 Mile pursuant to an absolute Assignment of Leases and Rents. Debtors also do not oppose 100 Mile's request that the Debtors be ordered to prepare an accounting of the cash generated from the properties. Thus, 100 Mile respectfully requests that on the return date the Court grant, as uncontested, 100 Mile's request that: (a) the Debtors be enjoined from utilizing any rents generated from the properties; and (b) the Debtors be compelled to produce an accounting of all cash generated from their properties for the past six months.

Debtors' defaults are well documented and cannot credibly be disputed. As elaborated upon below, the overwhelming evidentiary proofs confirm that the Debtors: (1) failed to disclose the existence of the $1,875,000 ATS Judgment against Mr. Rodriguez; (2) improperly stopped paying Taxes and Other Charges to the Village of Sleepy Hollow ("Sleepy Hollow") and other taxing authorities; and (3) failed to make their January 2016 debt service payment to 100 Mile. Each of these acts constitutes an event of default under the Loan Documents. Although the

---

[2] Capitalized terms used herein have the same meaning ascribed to said terms in the March 8, 2016 Affidavit of Anthony R. Iervolino (Docket No. 8-2).

Debtors insist that they are not in default, the Debtors do not address any of the evidence to the contrary in their opposition.

Making matters worse, financial documents recently produced by the Debtors make clear that the Debtors have either willfully misappropriated cash generated from the properties or are grossly mismanaging the properties. For example, the Debtors claim that they intentionally withheld payment of both their January 2016 debt service payment ($90,000) and their fourth quarter tax payments ($230,000). If the withholding of these payments was, as Debtors maintain, done in good faith, one would expect to see the funds necessary to cover these payments in the Debtors' accounts. <u>But the funds are not there</u>. In fact, at the time the Petitions were filed, the Debtors had, in total, just over $12,000.00 on deposit. In addition, in the months leading up to the Debtors' bankruptcy filings, the Debtors consistently failed to deposit all of their rental revenue. During the same time period, the Debtors' accounts also show tens of thousands of dollars in unexplained cash withdrawals. Debtors have failed to account for any of that cash.

Regardless of whether the Debtors' failure to account for their cash receipts is a result of the Debtors' malfeasance or simply their mismanagement of the properties, immediate relief is necessary to protect 100 Mile's interests. Accordingly, 100 Mile respectfully requests that the Court grant 100 Mile its requested relief.

## LEGAL ARGUMENT

### I. THE DEBTORS' CHAPTER 11 PETITIONS WERE FILED IN BAD FAITH.

Debtors acknowledge that the presence of the <u>C-TC</u> Factors are indicative of a bad faith filing. (Opposition Br., p. 2 (citing <u>In re C-TC 9th Ave. Partnership</u>, 113 F.3d 1304, 1311 (2d Cir. 1997)). Even though it is the Debtors' burden to establish that their Chapter 11 Petitions

2

were filed in good faith, the Debtors inexplicably analyze only one out of the eight C-TC Factors, to wit, the second C-TC factor: "[whether] the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors." As to that one factor, the Debtors' analysis misses the mark entirely.

Specifically, the Debtors argue that this is not a "two-party dispute" because, in addition to 100 Mile's secured claim, the Debtors owe $230,000 in delinquent tax obligations to Sleepy Hollow and owe $4,000 to Con Edison. (Opposition, ¶¶ 2-3.) But whether or not this is a two-party dispute is not the consideration that must be made under the second C-TC Factor. Rather, the actual analysis to be undertaken is a comparison between the amounts of the unsecured creditors' claims and the claims of the secured creditors. In this case, there is one unsecured creditor, Con Edison, with a mere $4,000.00 claim, as compared with 100 Mile's $9.5 million secured claim. That glaring disparity between the secured and unsecured claims is one indicia of a bad faith filing. Id. at 1311.

Consideration of the other CT-C Factors, which are not addressed in the Debtors' opposition, confirms Debtors' bad faith filing. For example, and as elaborated upon in 100 Mile's initial moving papers, each Debtor has only one asset that is generating insufficient cash flow. As a result, the Debtors are not able to pay their monthly debt service, expenses, and property taxes. Thus, contrary to the Debtors' cursory analysis, the presence of multiple CT-C Factors demonstrates that this case was filed in bad faith and that the Court should grant 100 Mile's Motion and, inter alia, either: (a) dismiss the Debtors' Chapter 11 Petitions; (b) grant

relief from the automatic stay; or (c) appoint a Chapter 11 Trustee to oversee and manage the Debtors' properties.[3]

**II. DEBTORS ARE EITHER WILLFULLY MISAPPROPRIATING CASH GENERATED FROM THE PROPERTIES OR ARE GROSSLY MISMANAGING THE PROPERTIES.**

On March 28, 2016, and only after Court intervention necessitated by the Debtors refusal to respond to discovery,[4] the Debtors produced: (1) the current rent roll for each of their properties; and (2) the Debtors' bank statements from December 2015 through March 2016. See Reply Affidavit of Anthony Iervolino ("Reply Aff."), Exh. A. Based on the limited information that was produced (the Debtors did not produce an accounting), it appears that significant amounts of cash was not deposited into the Debtors' accounts or was surreptitiously withdrawn. Examples from each Debtor's account are highlighted below.

**146-148 Cortlandt Street, LLC**

According to the Rule 1007-2 Declaration for 146-148 Cortlandt Street, LLC, the entity has monthly rental income of $26,890.00. Thus, the bank account statements for December through March should reflect four months of rental income deposits ($107,560.00). The bank

---

[3] Debtors' assertion that the properties have an equity cushion has no relevance to the relief sought in this motion, *i.e.*, imposing sufficient safeguards to protect the cash receipts generated from the properties. Moreover, while the Debtors may have had an equity cushion when the Loan was originated, that equity is deteriorating each and every day that the Debtors fail to pay their complete debt service obligations (including default interest) and property taxes. The properties' shrinking equity cushion, coupled with the Debtors' and Mr. Rodriguez's serial bankruptcy filings, casts a strong shadow of doubt on the Debtors' assertion that the Loan can be refinanced. Debtors have not offered any evidence that they have even attempted to refinance the Loan, and their unsubstantiated assertions regarding a potential refinance should be viewed skeptically by the Court.

[4] 100 Mile is taking the Court ordered deposition of Mr. Rodriguez on March 30, 2016. Debtors reserve the right to supplement this submission based on the facts uncovered at Mr. Rodriguez's deposition.

4

statements for 146-148 Cortlandt Street, LLC, however, reflect only $53,191.24 in deposits. There is no accounting for the $54,368.76 that was not deposited in 146-148 Cortlandt Street, LLC's account.

### Biombo, Inc.

According to the Rule 1007-2 Declaration for Biombo, Inc., the entity has monthly rental income of $25,745.00. Thus, the bank account statements for December through March should reflect four months of rental income deposits ($102,980.00). The bank statements for Biombo, Inc., however, reflect only $40,421.00 in deposits. There is no accounting for the $62,559.00 that was not deposited into Biombo, Inc.'s account.

### Dari Realty Corp.

According to the Rule 1007-2 Declaration for Dari Realty Corp., the entity has monthly rental income of $6,894.00. Thus, the bank account statements for December through March should reflect four months of rental income deposits ($27,576.00). The bank statements for Dari Realty Corp., however, reflect only $17,116.96 in deposits from December through March. There is no accounting for the $10,459.04 that was not deposited into Dari Realty Corp.'s account.

### Dashley Corp.

According to the Rule 1007-2 Declaration for Dashley Corp., the entity has monthly rental income of $16,175. Thus, the bank account statements for December through March should reflect four months of rental income deposits ($64,700.00). The bank statements for Dashley Corp., however, reflect only $22,857.57 in deposits. There is no accounting for the $41,842.43 that was not deposited into Dashley Corp.'s account.

### Shippy Realty Corp.

According to the Rule 1007-2 Declaration for Shippy Realty Corp., the entity has monthly rental income of $15,242.00. Thus, the bank account statements for December through March should reflect four months of rental income deposits ($60,968.00). The bank statements for Shippy Realty Corp., however, reflect only $21,907.47 in deposits. There is no accounting for the $39,060.53 that was not deposited into Shippy Realty Corp.'s account.

### 144 Cortlandt Street, LLC

According to the Rule 1007-2 Declaration for 144 Cortlandt Street, LLC, the entity has monthly rental income of $9,250.00. Thus, the bank account statements for December through March should reflect four months of rental income deposits ($37,000). The bank statements for 144 Cortlandt Street, LLC, however, reflect only $1,211.62 in deposits. Although documents produced by Borrower indicate that some of the rental revenue was deposited into other Debtor's accounts, there is still a significant amount of rental revenue for which there is no accounting.

### 173 Cortlandt St. LLC

According to the Rule 1007-2 Declaration for 173 Cortlandt St. LLC, the entity has monthly rental income of $8,000.00 and monthly expenses (not including debt service and taxes) of $1,800. Thus, the bank account statements for December through March should reflect four months of rental income deposits ($32,000.00) and payments of $7,200 in expenses. The bank statements for 146-148 Cortlandt Street, LLC, however, reflect a shocking $344,410.46 in deposits from December through March. On the surface, it appeared possible that the cash that was not deposited in the other six Debtor accounts was simply being deposited into the 173

6

Cortlandt St. LLC account. Upon a closer examination of the account statements, however, the records do not reflect that this occurred.

For example, the closing balance of this account before its funds were transferred to a debtor-in-possession account was $547.18. That amount is far less than one would expect to see if this was the primary account being used by the Debtors, particularly in light of their failure to pay $90,000 in debt service to 100 Mile and $230,000 in taxes during the time period of these account statements.

Moreover, the deposits into this account also did not remain in this account. In addition to the large amount of deposits, this account also had $325,202.41 in withdrawals/debits during the same time period. Although some of these withdrawals/debits appear to be legitimate, such as the payment of 100 Mile's December and February debt service payments, many of the debits/withdrawals are inexplicable. It is quite troubling for example, that nearly $100,000 in cash was withdrawn from this account during these four months.

Stated simply, the limited records that the Debtors have made available confirm what 100 Mile suspected all along, *i.e.*, that cash generated from the properties has gone missing. For that reason alone, and at minimum, 100 Mile is entitled to the appointment of a Chapter 11 trustee with the ability to engage an experienced residential property manager to collect rents. See In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) (if the Court finds that the Debtors have acted with dishonesty and/or have grossly mismanaged the properties, "there is no discretion; an independent trustee *must* be appointed") (emphasis added).

7

### III. DEBTORS DEFAULTED UNDER THE TERMS OF THE LOAN DOCUMENTS.[5]

Unable to satisfy their burden of demonstrating that these Chapter 11 cases were commenced in good faith, and unable to dispute that cause otherwise exists for the appointment of a Trustee, Debtors instead focus their opposition on the absurd contention that the Debtors are somehow not in default under the Loan Documents. As set forth in 100 Mile's initial moving papers, and as briefly elaborated upon below, documentary proofs make clear that the Debtors defaulted on their obligations on at least three separate occasions.

#### A. Debtors Failed to Disclose the ATS Judgment.

First, the Debtors unquestionably defaulted under the Loan Documents by failing to disclose the existence of the ATS Judgment. The Debtors do not dispute their failure to timely disclose the ATS Judgment. Instead, the Debtors attempt to shift the blame and accuse 100 Mile of improperly holding the "Debtors in default based upon [100 Mile's] own ignorance of the ATS Judgment." (See Debtors' Opposition, ¶ 10.)

Notwithstanding this outrageous statement, the Debtors and their counsel made affirmative representations in the Loan Documents that there were no undisclosed judgments or actions pending against the Debtors or Mr. Rodriguez. 100 Mile was entitled to rely, and did rely, on the Debtors' representations, which turned out to be patently false. Specifically, and as

---

[5] The Debtors cavalierly and nakedly argue these cases should not be dismissed because they are mere continuations of the Debtors' previously dismissed chapter 11 cases. The Debtors further contend they could have sought to reopen the dismissed cases, but opted not to because it was cheaper to file new petitions. The Debtors' argument is wildly off-base. A motion to reopen a previously closed and fully administered case is governed by section 350(b) of the Bankruptcy Code. That statute gives the bankruptcy court discretion to reopen the case "to accord relief to the debtor, or for other cause." Here, however, any relief the Debtors might have needed from their purported disputes concerning: (a) their defaults under the Loan Documents; or (B) the validity of the property taxes, should have been resolved in state court. The fact that the Loan Documents were approved by this Court is of no moment to the propriety of reopening the formerly dismissed Chapter 11 cases.

8

outlined at length in the March 8, 2016 Affidavit of Anthony R. Iervolino (the "Iervolino Aff."), the Debtors specifically represented in the Loan Agreement that:

> There is no action, suit, proceeding or investigation pending or, to [Debtors'] knowledge, threatened against [Debtors], Guarantor or the [Properties] in any court or by or before any other Governmental Authority which, if adversely determined, might have a Material Adverse Effect.

See Iervolino Aff., Exh. A, § 3.1.4.

The Debtors' counsel, Bruce Alter, Esq., also expressly represented:

> There is no action, suit, proceeding or investigation at law or in equity by or before any court, governmental instrumentality or other agency now pending or, to the best of our knowledge, threatened against the [Debtors or Guarantor] or any of the [Debtors' Properties] or rights which, if determined adversely to such [Debtors or Guarantor], would impair or materially affect (i) the value of the collateral securing the Loan Documents, (ii) such entities' or persons, as the case may be, ability to carry out its or his obligations under the Loan Documents to which it or he is a party, or (iii) the validity or enforceability of each of the Loan Documents, or (iv) in the case of [Debtors], its right to carry on [their] business substantially as now conducted. The [Debtors are] not in default with respect to any order, judgment, writ, injunction, decree or demand of any court or governmental authority.

Id., Exh. F, ¶ 9.

In fact, not only did the Debtors fail to disclose the ATS Judgment, they also failed to disclose the fact that ATS was actively attempting to collect on the judgment. Specifically, on or about March 18, 2015, before the Loan Documents were executed, ATS apparently served Mr. Alter, as Debtors' counsel, with an Information Subpoena With Restraining Notice in connection with the ATS Judgment. Several days later, on March 27, 2015, Mr. Alter responded, in writing, to the Information Subpoena. See Reply Aff., Exh. B. Despite this clear awareness of the ATS Judgment, several months later, both the Debtors and their counsel made affirmative statements to conceal the existence of the ATS Judgment from 100 Mile.

9

Debtors' assertion that 100 Mile "chose to ignore the existence of the ATS Judgment" is also entirely untrue. Before entering into the Loan transaction with Debtors, 100 Mile searched all available public records, including conducting title searches for each of the Debtors' properties. Because the ATS Judgment is against Mr. Rodriguez <u>individually</u>, and not against any of the Debtors, the ATS Judgment was not (and would not have been) recorded against any of the Debtors' properties and thus did not appear on 100 Mile's title searches. 100 Mile was not aware of the ATS Judgment at the time it made the Loan to Debtors. <u>See</u> Reply Aff., ¶ 2. Had 100 Mile had known about the ATS Judgment, it likely would not have made the Loan to the Debtors. (<u>Id.</u>)

Stated simply, the Debtors failure to disclose the ATS Judgment constitutes a material event of the default under the plain terms of the Loan Documents.

### B. **Debtors Failed to Pay Taxes and Other Charges.**

The Debtors' failure to pay Taxes and Other Charges to Sleepy Hollow constitutes an additional event of default.

Shortly after 100 Mile noticed Debtors' default for failing to disclose the ATS Judgment, 100 Mile also became aware that the Debtors had failed to pay certain School Tax, Village Tax, and Water District bills. (Iervolino Aff., ¶ 25.) Debtors, for their part, have taken the position that they intend to challenge Sleepy Hollow's tax assessment. (Opposition, ¶ 5.) Even that were true, however, Debtors failure to follow the procedure set forth in the Loan Documents for contesting Taxes and Other Charges, constitutes an event of default. Specifically, Section 4.13 of the Loan Agreement provides:

> After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Taxes or Other Charges, provided that (a) no Default or Event of Default shall have occurred and be continuing; (b) such proceeding shall be

10

permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (d) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (e) such proceeding shall suspend the collection of Taxes or Other Charges from the Property; and (f) Borrower shall deposit with Lender cash or other security as may be required in the proceeding, or as may otherwise be requested by Lender, to ensure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.

[See Iervolino Aff., Exh. A, § 4.13.]

Debtors failed to provide any prior notice to 100 Mile that Debtors were contesting their tax obligations. Indeed, 100 Mile is not aware of Debtors' reason for making this challenge, nor is 100 Mile aware of any proper legal challenge to the taxes ever being initiated. See Reply Aff., ¶¶ 3-4. Before 100 Mile would have authorized such a challenge it would, at minimum, have required Debtors to increase their tax escrow account to an amount sufficient to cover the disputed tax obligation. Id. Regardless, because Debtors were in default under the Loan Documents, they were not permitted to contest Taxes and Other Charges. Id.

As a final aside, 100 Mile's has never refused to release the Debtors' tax escrow. At all times from 100 Mile's discovery of the tax deficiency through the Debtors' bankruptcy filing, the Debtors have maintained that they are contesting the tax amount owed to the Village of Sleepy Hollow. There is absolutely no reason for 100 Mile to pay a debt that the Debtors claim they do not owe. In any event, there is only $82,375.43 in the Debtors' tax escrow account, which would be insufficient to pay the Debtors' $230,000 tax liability. Id., ¶ 5.

11

### C. Debtors Failed to Pay Their January 2016 Debt Service Obligation.

The Debtors' failure to pay their January 2016 debt service obligation also constituted an event of default under the Loan Documents.

The Debtors' monthly debt service is paid in arrears. For example, on January 1, 2016, Debtors were required to pay the December 2015 debt service payment. See Reply Aff., ¶ 6. As reflected in Debtors' opposition papers, the payment of the December 2015 debt service payment was made on January 10, 2016. (Opposition, ¶ 6.)

Debtors have not paid their January 2016 debt service payment, in the approximate amount of $90,000.00, which was due to 100 Mile by February 1, 2016. At the time that 100 Mile's initial motion papers were filed, Debtors had also not paid their February 2016 debt service payment, which was due by March 1, 2016. See Iervolino Aff., ¶ 29. Although the Debtors have since made that payment, the Debtors have still failed and refused to account for January 2016 debt service payment that was never made. See Reply Aff., ¶ 7. Thus, the Debtors' third default remains uncured.

## CONCLUSION

The Debtors' opposition, which is premised on the flawed argument that the Debtors are not in default under the Loan Documents, is wholly without merit. The Debtors have flagrantly and repeatedly defaulted under the Loan Documents, and none of those defaults have been cured. Making matters worse, and as described above, the cash generated from the properties has not all been deposited into the Debtors' accounts, nor can the cash that was deposited be fully accounted for. Thus, for all of the foregoing reasons, 100 Mile respectfully requests this Court grant 100 Mile's Motion and, inter alia, either: (a) dismiss the Debtors' Chapter 11 Petitions; (b) grant relief from the automatic stay; or (c) appoint a Chapter 11 Trustee to oversee and manage the

Debtors' properties. In addition, 100 Mile asks that the Court grant, as unopposed, 100 Mile's requests that: (1) the Debtors be enjoined from utilizing any rents generated from the properties; and (2) the Debtors be compelled to produce an accounting of all cash generated from the properties for the past six months.

DATED:  New York, New York
        March 29, 2016

>                    Respectfully submitted,
>
>                    COLE SCHOTZ P.C.
>                    Attorneys for 100 Mile Fund, LLC
>
>                    By:    */s/ Leo V. Leyva*
>                           Leo V. Leyva
>                           Ilana Volkov
>                           1325 Avenue of the Americas
>                           19th Floor
>                           New York, NY 10019
>                           Tel. (212) 752-8000

13